**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COLORADO WILD PUBLIC LANDS**, | |
| Plaintiff, | |
| v. | Case No. 21-cv-2802 (CRC) |
| **U.S. FOREST SERVICE**, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

In early 2021, Colorado Wild Public Lands ("COWPL") submitted multiple Freedom of Information Act ("FOIA") requests to the United States Forest Service (the "Forest Service" or the "Service") for documents concerning the agency's evaluation of a proposed land exchange in the San Juan National Forest, including third-party appraisals of the relevant parcels. The Forest Service initially refused to produce most of the requested evaluation documents based on its internal policies that forbid disclosing such documents until the underlying appraisals have been approved for agency use and the land exchange has been finalized. After many months of litigation and delay, the Forest Service eventually turned over almost all the requested documents except for several redactions under Exemption 5 based on the deliberative process privilege and Exemption 6 based on privacy concerns. The Service then moved for summary judgment on the ground that it produced all reasonably segregable, non-exempt portions of responsive records. COWPL responded by filing a cross motion for summary judgment on its claim that the Service's policy and practice of withholding documents until a land exchange is completed violates FOIA. The Court now assesses these dualling motions.

Beginning with the Forest Service's motion, the Court concludes that the Service has failed to show that all materials withheld under Exemption 5 are deliberative or that releasing

them would cause foreseeable harm.  By contrast, the Service mostly satisfied its burden of justifying the withholdings under Exemption 6, with one exception regarding the redactions of realtors' contact information.  The Court will, accordingly, grant the Service's motion in part and deny it in part.  With respect to COWPL's cross motion, the Court finds that the Forest Service's policies violate FOIA by imposing additional restrictions that go above and beyond the statutory exemptions.  The Court therefore will grant COWPL's request for a declaratory judgment to that effect.

### I.    Background

In November 2019, the Forrest Service announced it was considering a land exchange proposal in the Valle Seco portion of the San Juan National Forest in Colorado.  See Mot. for Summ. J. ("MSJ"), Ex. 1, U.S. Forest Service's Statement of Undisputed Material Facts ¶ 1. Under the proposed terms, the United States would acquire approximately 900 acres of privately owned land in exchange for eleven parcels of National Forest System land spanning close to 472 acres.  Id. ¶ 2.

Concerned about the terms of the proposed land exchange, COWPL emailed the Forest Service in September 2020 requesting records related to the transaction.  Id. ¶ 11.  A district ranger responded with a letter directing COWPL to publicly available materials and providing the contact information for the San Juan National Forest FOIA Coordinator, id. ¶¶ 12–13, but he did not assign a FOIA tracking number to this initial inquiry because he determined that the email was not an official FOIA request, id. ¶ 14.  Later that month, COWPL followed up with a request for "appraisals and related documents" involving the proposed land exchange, which the Forest Service construed as a formal FOIA request and answered by providing some responsive

documents while withholding others.  Compl. ¶ 17.  COWPL did not challenge these withholdings before the period to appeal elapsed in January 2021.  MSJ, Ex. 1 ¶ 19.

The organization instead lodged what the Forest Service construed as two additional FOIA requests in early 2021, which are the basis of the current litigation.[1]  In March, COWPL requested that the Forest Service turn over the Technical Appraisal Review Report ("TARP") it had used when assessing the Valle Seco exchange.  Id. ¶ 20.  And in May, COWPL asked the Service to produce all underlying appraisals estimating the fair market value of each parcel that it had prepared for the proposed exchange.  Id. ¶ 25.  These appraisals were prepared by an outside contractor who served as the Service's "client."  See Forest Service Reply, Ex. B ("Statement of Work") at 2, 9.  Both the appraisals and the TARP, which assesses the appraisals for accuracy and completeness, serve an important role in the process by ensuring that the exchanged lands are of approximately equal value, as required under 43 C.F.R. § 2201.5.

The flow of information in response to these requests was a slow trickle.  The first round of disclosures included hefty redactions, as the Service claimed Exemption 5 based on the deliberative process privilege and Exemption 6 due to personal privacy concerns.  See MSJ, Ex. B, Declaration of Margaret Scofield ("Scofield Decl.") ¶ 6 ("[T]he Forest Service produced the Technical Appraisal Review Reports to Colorado Wild, with two (2) pages released in full, two (2) pages withheld in part, and 54 pages withheld in full pursuant to Exemption 5."); id. ¶ 8 ("The Rocky Mountain Regional FOIA Service Center responded to this FOIA request in a letter dated June 23, 2021, stating that it had located 1,028 pages of responsive records that it would withhold in full under Exemptions 5 and/or 6.").  In reality, many of these initial redactions were

---

[1]  COWPL complains that the Forest Service wrongly "split the original request into three requests and two administrative appeals" in an effort to evade compliance and delay disclosures. See Opp'n to MSJ at 6–7.  Because this dispute is not relevant to the disposition of this matter, the Court analyzes the requests in accordance with how the Forest Service processed them.

directly predicated not on an interpretation of FOIA's statutory exemptions but rather on an application of the Forest Service's internal policies forbidding the release of valuation documents until the Service had approved them for agency use and, even then, not until the Service had finalized the proposed land exchange.

Forest Service Manual Rule 5401.74c.3 states that "[c]ompleted, signed appraisal review reports, appraisal consulting reports, and other valuation products that have been accepted for Agency use by an Authorized Officer and are part of the official Agency record may be released by the Regional Director of Lands or equivalent official, in whole or in part, after review by the Regional Appraiser."  Opp'n to MSJ, Ex. 7 at 2.  Comment 3 further clarifies that, "prior to releasing the information, the valuation products [must] have been accepted for Agency use by an Authorized Officer and [be] part of the official Agency record," id. at 3, and reiterates that, "[i]f they have not be[en] accepted for Agency use, by policy we cannot release [them]," id.  But even documents that the Forest Service has "accepted for Agency use" are still not necessarily eligible for release, as Rule 5412.11 instructs:

> [T]he final approved appraisal report(s) and appraisal review report(s) for Federal and non-Federal lands in land exchange transactions shall be made available, upon written request, to all interested parties when: [1] An environmental assessment or draft environmental impact statement is released for public comment identifying a preferred alternative, and the appraisal report(s) have been reviewed and approved for agency use, or; [2] The National Environmental Policy Act (42 U.S.C. 4321) decision to approve an exchange is made, and public notice given.

Mot. to Enforce Settlement Agreement, Ex. 12 at 4.  Internal emails show that Forest Service officials were acutely aware of these policies when deciding how to respond to COWPL's FOIA requests.  These officials repeatedly stated that they should not release draft appraisals that had not received the Forest Service's official seal of approval.  See, e.g., Opp'n to MSJ, Ex. 13 at 2 (quoting Rule 5401.74's "accepted for Agency use" requirement).  Others insisted that even

officially approved documents must be withheld until the Valle Seco land exchange had been finalized.  See, e.g., Opp'n to MSJ, Ex. 5 at 5 (noting the "land exchange decision has not been finalized yet" when discussing whether to release the TARP); Opp'n to MSJ, Ex. 6 at 1 ("We ended up moving forward with the heavy redactions of the appraisal reports based on exemption 5 of the FOIA since there has been no decision made on Valle Seco."); Opp'n to MSJ, Ex. 11 at 2 ("At a minimum, I recommend that appraised values and other valuation information in the appraisal not be shared until the Agency has made a planning decision on the land exchange.").

COWPL responded by timely appealing the Forest Service's initial productions and then filing the present action in this Court under 5 U.S.C. § 552(a)(4)(B).  COWPL's complaint alleges that the Forest Service "violated FOIA by illegally withholding agency records that are responsive to [its] FOIA Request[s], but which Defendant has not demonstrated are subject to any FOIA withholding provision," including Exemptions 5 and 6.[2]  Compl. ¶¶ 84–85.  These purported violations were not isolated mistakes, the complaint charges, but rather the result of "agency policies that direct personnel to withhold information regarding property values until after the [National Environmental Policy Act ("NEPA")] process is complete, after administrative review is complete, and after final agency action is taken on a land exchange."  Id. ¶ 19.  Additionally, the complaint maintains that the Service has a further "unlawful policy of only sharing . . . valuation information with persons advocating for the land exchange, and denying access to Plaintiff and similarly situated persons" who may oppose the exchange.  Id.  It further contends that, because of these policies, COWPL had been "denied access to appraisals for federal land exchanges on multiple occasions" and warns that history will likely repeat itself

---

[2]  The complaint also alleged that the Forest Service's search was inadequate, see Compl. ¶ 83, but COWPL has voluntarily dismissed this claim, see Opp'n to MSJ at 3.

without judicial intervention, noting that the group has "definite plans to continue to request" similar information in the future.  Id.

 After this case was filed, the Forest Service steadily released more and more information bit by bit.  See Scofield Decl. ¶¶ 7, 9.  One of the driving forces behind these subsequent releases was a fact COWPL alleged in its complaint:  The Forest Service already had shared many of the requested documents with outside parties, such as the Western Land Group, a Denver-based real estate consultancy which had supported the land exchange.  See Compl. ¶ 54; Opp'n to MSJ, Ex. 19, Plaintiff's Statement of Disputed Material Facts ¶¶ 16, 22, 24.  The "Statement of Work for the Proposed Valle Seco 2019 Land Exchange" lists Western Land Group and other proponents of the exchange as "intended users" of the appraisals and TARP.  See Statement of Work at 2. The Forest Service thus provided these outside actors with access to the final appraisals and the TARP "after the technical review [was] completed," id. at 7, and agency officials later appeared to acknowledge that this disclosure waived any deliberative process privilege over the distributed materials, see Scofield Decl. ¶ 7 ("The Washington Office FOIA Service Center came to learn that some of the withheld records previously had been shared with parties outside the Forest Service, and on December 22, 2021, it issued an updated production with all deliberative process redactions removed."); see also FTC v. Meta Platforms, Inc., No. 20-cv-3590 (JEB), 2022 WL 4078930, at *6 (D.D.C. Sept. 6, 2022) ("The D.C. Circuit has recognized that voluntary disclosure of privileged material to unnecessary third parties waives the deliberative-process privilege for the document or information specifically released." (cleaned up)).

 After multiple months of further disclosures, what was once a long list of withholdings has dwindled to a small set of redactions.  See Scofield Decl. ¶ 7 (describing releases relating to the March request and stating that the "updated production consisted of 58 pages [of the TARP],

56 of which were produced in full, and two (2) of which were withheld in part under Exemption 6"); id. ¶ 9 (explaining that the Service has now released 1,086 pages of final and draft appraisals in response to the May request and that, "[o]f these, it produced 1,034 pages in full and 52 pages withheld in part with redactions under Exemptions 5 and/or 6.").  Under Exemption 5, the Forest Service continues to assert the deliberative process privilege over three pieces of information that appear in draft appraisals: (1) analysis based on legal and factual assumptions that later were determined to be inapplicable to the exchanged lands; (2) an inaccurate figure for the combined acreage for the privately owned lands in the exchange; and (3) the names of private individuals who were not involved in the exchange but whose names were included in the draft appraisals because of a miscommunication.  See MSJ at 4–5.  Under Exemption 6, the Forest Service has redacted from the appraisals and/or the TARP "(1) a work cell phone number of a Forest Service employee and (2) cell phone numbers and an email address belonging to private citizens who were involved in recent sales of comparable land parcels."  Id. at 5.

The Forest Service now moves for summary judgment on the ground that it produced all reasonably segregable, non-exempt portions of the record and that the remaining redactions fall within the statutory exemptions under 5 U.S.C. § 552(b).  The Service submitted in support of its motion a declaration by its Assistant Director for FOIA, Margaret Scofield, detailing COWPL's FOIA requests and explaining the applications of Exemptions 5 and 6 to the withheld materials. See generally Scofield Decl.  COWPL opposes this motion.  It contends that the Forest Service failed to prove that these exemptions apply to the withheld materials and that, regardless, the Service waived any right to assert these exemptions because those materials were prepared by and shared with parties outside the agency.  See Opp'n to MSJ at 22–36.

COWPL does not itself move for summary judgment on these issues, however. It instead cross-moves for summary judgment on the theory that, beyond the particular dispute in this case, the Forest Service has an unlawful policy or practice of withholding valuation records from the opponents of land exchanges (even though it routinely provides some of this information to outside proponents) until after the Service has officially approved the documents and finalized the land exchange. See Cross MSJ at 13–21. Such delay, COWPL contends, impedes its ability to participate fully in the NEPA-review and notice-and-comment processes. See id. The Forest Service does not mount a substantive defense of these policies. Rather, it asserts that the Court cannot consider the matter because COWPL did not properly allege a policy-or-practice claim in its complaint and because any such claim is now moot. See Forest Service Reply at 19–28. To support the Service's mootness position, Ms. Scofield submitted a second declaration stating that the Forest Service is currently in the process of revising its policies and explaining that she has instructed the agency's FOIA Coordinators to comply with the proposed revisions immediately. See id., Ex. 1, Declaration of Margaret Scofield ("Second Scofield Decl.") ¶¶ 2–5.

## II.   Legal Standards

FOIA cases are typically resolved on summary judgment. See Brayton v. Off. of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). When reviewing an agency's motion for summary judgment under FOIA, "the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester," and summary judgment is appropriate only after "the agency proves that it has fully discharged its FOIA obligations." White Coat Waste Proj. v. U.S. Dep't of Veterans Affs., 404 F. Supp. 3d 87, 95 (D.D.C. 2019) (cleaned up).

Those obligations include satisfying the agency's duty to justify "any withholdings it makes under FOIA's exemptions from disclosure." Bagwell v. U.S. Dep't of Justice, 311 F. Supp. 3d 223, 228 (D.D.C. 2018). Because FOIA is designed to "establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language," NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 136 (1975) (citation omitted), the statute's exemptions are construed narrowly, and the agency bears the burden of justifying every withholding, Bagwell, 311 F. Supp. 3d at 229. Additionally, under the FOIA Improvement Act of 2016, an agency may withhold information that falls within a statutory exemption only if "the agency reasonably foresees that disclosure would harm an interest protected by [that] exemption" or if the "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "The foreseeable harm requirement imposes an independent and meaningful burden on agencies." Reps. Comm. for Freedom of the Press v. FBI, 3 F.4th 350, 369 (D.C. Cir. 2021) (cleaned up). To satisfy its burden, an agency that withholds documents under the deliberative process privilege must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." Id. at 370.

Beyond challenging an agency's withholdings in response to a particular request, a plaintiff may be entitled to declaratory or equitable relief if it can show that the agency employs a "policy or practice [that] will impair [its] lawful access to information in the future." Payne Enters., Inc. v. United States, 837 F.2d 486, 491 (D.C. Cir. 1988) (emphasis removed). "To state a policy-or-practice claim, a plaintiff must plausibly allege 'that the agency has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing 'failure to abide by the terms of the FOIA.'" Am. Ctr. for L. & Just. v. U.S. Dep't of State, 249 F. Supp. 3d 275, 281

(D.D.C. 2017) (quoting <u>Muttitt v. Dep't of State</u>, 926 F. Supp. 2d 284, 293 (D.D.C. 2013)).

"That is to say, a plaintiff must plead (1) some policy or practice that (2) results in a repeated

violation of FOIA." <u>Id.</u> At the summary judgment stage, a party bringing a policy-or-practice

claim "must establish that 'there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law.'" <u>Nat'l Sec. Couns. v. CIA</u>, 960 F. Supp. 2d 101, 133

(D.D.C. 2013) (quoting Fed. R. Civ. P. 56(a)).

### III. Analysis

Regarding the Forest Service's motion for summary judgment, the Service uniformly

failed to justify its assertions of the deliberative process privilege under Exception 5 because it

either failed to show that the withheld material was deliberative or that disclosure would harm an

interest protected by that exemption.  By contrast, the Service for the most part met its burden of

proving that it validly withheld material under Exception 6, with the lone exception that it did

not demonstrate that real estate agents have a substantial privacy interest in keeping their contact

information private given that it is likely already in the public domain.  The Court will thus grant

the Service's motion in part and deny it in part.  As to the cross motion, the Court finds COWPL

adequately alleged a policy-or-practice claim in its complaint and that the Service's intervening

actions do not moot this claim because their preliminary steps to amend the Manual policies have

not alleviated COWPL's ongoing injury or ensured against future violations.  On the merits, the

Court finds that the Service's current policies do not comport with FOIA's requirements and thus

will grant COWPL's motion and enter a declaratory judgment in its favor.  The Court addresses

these two motions in turn.

A.  Forest Service's Motion for Summary Judgment

Beginning with the Forest Service's motion, the Service is still withholding portions of draft appraisals under Exemption 5 based on the deliberative process privilege as well as personal contact information under Exemption 6 based on privacy concerns.  For both sets of redactions, the onus is on the Forest Service to show that the information it is withholding falls within the exemption and that disclosure would harm an interest that exemption seeks to protect. The Court concludes that the Service failed to carry this burden on Exemption 5 but, for the most part, sufficiently justified its Exemption 6 withholdings.  A split decision on the motion for summary judgment is therefore in order.

   1.  *Exemption 5*

Exemption 5 permits an agency to withhold "intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "This means, in effect, privileged documents that originated with the agency."  Touarsi v. U.S. Dep't of Just., 78 F. Supp. 3d 332, 344 (D.D.C. 2015).  The Forest Service has invoked the deliberative process privilege, which is "rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  U.S. Fish & Wildlife Serv. v. Sierra Club, Inc., 141 S. Ct. 777, 785 (2021) (citation and quotation marks omitted).  The privilege applies if "the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  Env't Integrity Proj. v. Small Bus. Admin., 125 F. Supp. 3d 173, 176–77 (D.D.C. 2015) (quoting Formaldehyde Inst. v. U.S. Dep't of Health & Hum. Servs., 889 F.2d 1118, 1122 (D.C. Cir. 1989)).

To fall within Exemption 5 based on the deliberative process privilege, a document must be both "predecisional" and "deliberative." Machado Amadis v. Dep't of State, 971 F.3d 364, 370 (D.C. Cir. 2020). A given document is predecisional if it was "generated before the adoption of an agency policy" and is prepared to assist the agency decisionmaker in arriving at an opinion. Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). This is typically a simple determination. "Determining whether a document is deliberative is less straightforward," as the test is "dependent upon the individual document and the role it plays in the administrative process." Jud. Watch, Inc. v. U.S. Dep't of Just., 20 F.4th 49, 55 (D.C. Cir. 2021) (citation omitted). At one end of the spectrum, an "agency can establish deliberativeness by showing that the withheld record makes recommendations or expresses opinion on legal or policy matters." Jud. Watch v. U.S. Dep't of State, 557 F. Supp. 3d 52, 59 (D.D.C. 2021) (cleaned up). At the opposite end, purely factual information generally is not protected because mere facts do not reflect the deliberative give-and-take that the exemption safeguards. See Reps. Comm., 3 F.4th at 365. "While the fact/opinion distinction is not a wooden rule, it is a rough guide for sifting out non-deliberative factual content from deliberative policy judgments." Id. (citation and quotation marks omitted). Whether information appears in a draft document is also not conclusive, as the D.C. Circuit has held that documents entitled "draft" are not "per se exempt" and that the agency must segregate and release all non-deliberative portions of draft documents. Arthur Andersen & Co. v. IRS, 679 F.2d 254, 257–58 (D.C. Cir. 1982).

Before addressing whether the Forest Service has met this dual requirement, COWPL contends that the Forest Service's assertions of the deliberative process privilege stumble out the gate because the draft appraisals were prepared by an outside appraiser and shared with third

parties.  As a result, COWPL contends that the draft appraisals do not constitute "intra-agency" communications under Exemption 5.  Opp'n to MSJ at 28–31.  The Court disagrees.

Starting with the fact that a private appraiser prepared the draft appraisals, the so-called consultant-corollary doctrine "extends [Exemption 5] to communications between Government agencies and outside consultants hired by them" so long as "the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 10 (2001).  Here, the Forest Service hired the appraiser to perform appraisal services in connection with the Valle Seco land exchange, and nothing in the record suggests that this neutral appraiser represented the interests of any party other than the Forest Service.  See Forest Service Reply at 6; Second Scofield Decl. ¶ 7.  Although COWPL notes that outside parties are listed as "intended users" of the appraiser's work product, the Service is the only listed client.  See Statement of Work at 2, 9. Accordingly, there does not appear to be a genuine dispute over whether the appraiser acted as a disinterested, expert consultant and thereby falls under the Service's ambit for FOIA purposes. See, e.g., Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def., 512 F.3d 677, 682–83 (D.C. Cir. 2008) (holding that outside lawyers' comments were exempt from FOIA because the Department had "sought these individuals out and solicited their counsel based on their undisputed experience and qualifications" and there was no indication of bias in the record).

COWPL's assertion that the Forest Service shared the withheld documents with outside parties is also unsupported.  To be sure, it is undisputed that the Forest Service shared *some* materials with the Western Land Group and other proponents of the land exchange.  See, e.g., COWPL Reply, Ex. 1 at 1 (Forest Service emails sharing the Statement of Work with Western Land Group); COWPL Reply, Ex. 8 (Western Land Group requesting the TARP).  But there is

no evidence in the record that the Service ever shared the portions of the draft appraisals that it is currently withholding with any outside entity.  If anything, the record suggests the opposite.  The appraiser's Statement of Work specifies that "[t]he appraiser may provide information about the assignment, appraisals results, or portions thereof only to the Senior Review Appraiser" and that final "[a]ppraisals may only be distributed to the intended users <u>after</u> the technical review is completed."  Statement of Work at 7.  Ms. Scofield also averred the draft appraisals "were never shared beyond the Forest Service," Second Scofield Decl. ¶ 8, and this declaration is accorded a presumption of good faith, <u>see</u> <u>SafeCard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  Ultimately, COWPL bore the "burden of producing at least some evidence that the deliberative process privilege has been waived," but it provides no concrete evidence that these draft appraisals were divulged.  <u>Elec. Frontier Found. v. U.S. Dep't of Just.</u>, 890 F. Supp. 2d 35, 46 (D.D.C. 2012).

Given that the documents at issue here were "intra-agency" in the relevant sense, the Court can turn its attention to whether those documents are both predecisional and deliberative. To recap, the Forest Service is currently withholding three pieces of information that appeared in draft appraisals and were all removed before the appraisals were finalized: (1) analysis based on legal and factual assumptions that later were determined to be inapplicable to the land at issue; (2) an inaccurate figure for the combined acreage for the privately owned lands in the exchange; and (3) the names of private persons not involved in the exchange whose names were included in draft appraisals due to a miscommunication.  <u>See</u> MSJ at 4.  It is undisputed that these records were *predecisional* because they all appear in draft appraisals that were prepared in advance of the Forest Service's decision to proceed with the Valle Seco land exchange.  The key question is whether they are also *deliberative*.

For the latter two pieces of withheld information, the answer is clearly no.  The names of private individuals in no way reflect "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Sears, Roebuck & Co., 421 U.S. at 149 (citation omitted).  These names do not "bear on the formulation or exercise of agency policy-oriented judgment."  Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis removed).  They are instead simple facts that fall outside the scope of Exemption 5, even if the names appear in a "draft" appraisal, because they do not reflect the give-and-take of the deliberative process.  See Am. Immigr. Council v. U.S. Customs & Border Patrol, 590 F. Supp. 3d 306, 325 (D.D.C. 2022).[3] The erroneous useable-acreage figure for the private parcels similarly appears to be purely factual (albeit inaccurate) information, and the Forest Service has not indicated that these estimates reflect a "complex set of judgments" that would trigger the deliberative process privilege's protections.  Quarles v. Dep't of Navy, 893 F.2d 390, 392–93 (D.C. Cir. 1990) (holding that the Navy had properly withheld cost estimates under Exemption 5 because they are "derive[d] from a complex set of judgments—projecting needs, studying prior endeavors and assessing possible suppliers.").

The first piece of withheld information—the appraiser's analysis in a draft appraisal that was based on incorrect factual and legal assumptions—presents a much closer question.  The

---

[3]  The Forest Service mentions in a footnote that this information "also falls within Exemption 6's scope," MSJ at 12 n.4, but this gesture to Exemption 6 is insufficient to meet the Service's burden at summary judgment.  Furthermore, the Scofield Declaration does not list this information in its description of the "[i]nformation withheld under Exemption 6," Scofield Decl. ¶¶ 12–17, and it is "a foundational principle of administrative law that judicial review of agency action is limited to the grounds the agency invoked when it took the action," DHS v. Regents of the Univ. of Cal.,140 S. Ct. 1891, 1907 (2020) (citation and quotation marks omitted).

first Scofield declaration states that the "draft [a]ppraisals contained analysis that assumed that conveyance of certain parcels would not be subject to certain administrative requirements under Colorado law" but that the "Forest Service subsequently determined that these requirements did apply to the parcels at issue."  Scofield Decl. ¶ 10.  It further explains that the "draft [a]ppraisals also calculated the usable acreage of certain parcels to the Forest Service specifically, which differed from what the usable acreage would be to another purchaser given the Forest Service's ownership of abutting parcels."  Id.  From these statements, which constitute the entire extent of the Forest Service's description of the withheld material, the Court is not entirely confident that all withheld material reflects the give-and-take of the deliberative process.  The word "analysis" suggests the appraiser may have conducted a complicated estimation of the land value based on a flawed understanding of state law, which very likely would fall under the deliberative process privilege.  However, the declaration fails to explain what the relevant law was, how it affected the calculations, and what analysis is currently being withheld.  It also provides no detail on how the appraiser tabulated the useable acreage, leaving open the possibility that this error resulted from a mere mistake of fact rather than faulty analysis.  Perhaps it was a bit of both, in which case the Service must segregate and release all non-deliberative material.  See 5 U.S.C. § 552(a)(8)(A)(ii)(I).  But the Court is left guessing, and certainty (or close to it) is required when awarding summary judgment.

Even if the Court were to determine that this material is deliberative, that finding would not end the inquiry because the FOIA Improvement Act of 2016 adds an additional requirement: foreseeable harm.  Troubled that agencies were overusing the deliberative process privilege and thereby frustrating FOIA's basic goal of transparency, see H.R. Rep. No. 114-391, at 10 (2016), Congress restricted agencies' ability to withhold internal, deliberative records to situations where

an agency "reasonably foresees that disclosure would harm an interest protected by [Exemption 5]." 5 U.S.C. § 552(a)(8)(A)(i)(I).  This foreseeable harm requirement has real teeth.  An agency claiming the deliberative process privilege "cannot rely on mere speculative or abstract fears, or fear of embarrassment, to withhold information.  Nor may the government meet its burden with generalized assertions."  Reps. Comm., 3 F.4th at 369 (cleaned up).  The agency instead must point to a "specific, identifiable harm that would be caused by a disclosure."  Jud. Watch, Inc. v. U.S. Dep't of Com., 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (quoting H.R. Rep. No. 114-391, at 9 (2016)).

In its motion for summary judgment, the Forest Service failed to show that the release of any of the above material withheld under Exemption 5 would cause reasonably foreseeable harm.  Because it is plainly obvious that releasing the redacted names would not harm any deliberative processes, the Court focuses on the other withheld records—the incorrect acreage figures and the inaccurate analysis based on mistaken assumptions about Colorado law.  The Service makes two sets of arguments for why release of these records would cause harm, but neither carries the day.

For starters, the original Scofield declaration asserts that "[r]eleasing this information would undermine the Forest Service's ability to prepare complete, accurate, and high-quality [a]ppraisals, which are necessary to effectuate land exchanges, by chilling the open and candid identification, discussion, and correction of factual and analytical errors in draft [a]ppraisals."  Scofield Decl. ¶ 11.  But this sort of "boilerplate" and "generic" assertion of a chilling effect is insufficient to satisfy the meaningful burden of providing a "concrete demonstration of why disclosure of the particular type of material at issue will . . . actually impede [the Service's] deliberations going forward."  Reps. Comm., 3 F.4th at 370.  There is no reason to believe that revealing this information would prevent the free flow of ideas within the Service or thwart the

agency from producing "accurate" and "high-quality" appraisals given that these records do not appear to contain any policy proposals or recommendations.  They are simply inaccuracies, and disclosing these errors may improve (rather than stymie) the appraisal process.  The Court cannot nullify the FOIA Improvement Act by allowing an agency to bypass its harm requirement with such a "perfunctory statement that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information."  Id. at 370 (cleaned up); see also Ams. for Fair Treatment v. USPS, No. 22-cv-1183-RCL, 2023 WL 2610861, at *12 (D.D.C. Mar. 23, 2023) (rejecting a generic assertion of a chilling effect and insisting that an "agency cannot carry its burden simply by turning that generic rationale into a game of Mad Libs and filling in the blanks with the name of the agency and the things that it does" (cleaned up)).

Perhaps sensing the weakness in its generic chilling effect argument, the Forest Service attempts to supplement its reasoning in its reply brief by submitting a second declaration from Ms. Scofield detailing an alternative, winding path through which disclosing these errors could harm the Service's internal appraisal processes.  This supplemental declaration opines that the "Forest Service sometimes struggles to procure the services [of] qualified appraisers, who fear that working with the Forest Service unduly risks exposing their work product and proprietary information to their competitors."  Second Scofield Decl. ¶ 11.  It then notes that "[t]hree factors contribute to this concern": (1) the Forest Service is subject to FOIA's disclosure requirements and thus the appraisers fear that proprietary information may be released; (2) the Service owns less land that the Bureau of Land Management ("BLM")—193 million acres compared to 245 million acres—so appraisers are less willing to work with the Service; and (3) appraisers are in high demand and can afford to refuse to work with the Service.  Id. ¶¶ 12–14.  Under these three conditions, Scofield contends that "[r]eleasing the redacted portions of the draft appraisals would

further discourage qualified appraisers from working with the Forest Service" because it would "embarrass the appraiser" who drafted them and make other "appraisers less willing to work with the Forest Service on future land exchange proposals." Id. ¶ 15.

This theory does not rise to the level of *reasonably foreseeable* harm. First of all, these background conditions have little if anything to do with the challenged withholdings here and are otherwise unpersuasive. If some appraisers fear the release of their proprietary information, which is not included in the redacted records and is separately protected under Exemption 4, those fears will remain regardless of the outcome in this case. It is also hard to fathom how the fact that the Service owns four-fifths the acreage of the BLM matters given that both entities are among the largest landowners in America and major sources of potential appraisal business. To the extent the core argument is that releasing these mistakes will embarrass the appraiser and scare off future partnerships, color the Court skeptical. It seems implausible that appraisers would turn down the Forest Service's business if it revealed the appraiser's error, especially given that the public already knows that the appraiser made these errors in his draft appraisals. Plus, everyone knows that mistakes happen and that corrections will be made during the review process. If the error here happens to be so egregious that it would cause embarrassment (which, again, the Court doubts), severing ties with this one appraiser would not scare off more competent partners and could potentially be a boon for appraisal accuracy and quality. That is all to say that this round-about hypothesis of harm is far too speculative given that "agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." Reps. Comm., 3 F.4th at 369–70 (quoting Machado Amadis, 971 F.3d at 371).

In addition to interfering with the agency's internal appraisal process, the Forest Service also contends that disclosing this information possibly could sow confusion among the public.

Ms. Scofield asserts that the "release of factual and analytical inaccuracies in the draft [a]ppraisals *may* confuse or mislead the public as to the reasons for the Forest Service's eventual decision regarding the proposed land exchange, by erroneously suggesting that the Forest Service's potential decision-making rested on these factual and analytical inaccuracies that the Forest Service in fact did not rely on."  Scofield Decl. ¶ 11 (emphasis added).  Once more, such conjecture about the possibility of confusion is insufficient to show harm.  That is especially true in this case because it would be a simple task for the Forest Service to clear up any confusion by doing exactly what Scofield did in her declaration: explain that these errors appeared in draft appraisals and that the errors were corrected and removed from the final appraisals that the agency used when assessing the land exchange.  Easy enough.  When such a straightforward explanation will do the trick, the harm requirement—and the overall logic of FOIA—forbids an agency from opting to keep the public in the dark.  Cf. Petroleum Info. Corp., 976 F.2d at 1433 (rejecting an assertion of Exemption 5 where the agency did "not convincingly explain why its concerns with public confusion and harming its own reputation could not be allayed by conspicuously warning FOIA requesters that the LLD file is as yet unofficial and that the Bureau disclaims responsibility for any errors or gaps").

The Court therefore concludes that the Forest Service has not shown that the release of any of the withheld material would cause reasonably foreseeable harm because its worries over its effect on the appraisal process appear overblown and its concerns over public confusion are speculative at best.  In addition to its failure to demonstrate that much (if any) of the withheld material is deliberative, this failure to show foreseeable harm is a sufficient reason to deny the Service's motion for summary judgment with respect to its applications of Exemption 5.

2. *Exemption 6*

The Forest Service fares better when it comes to Exemption 6.  That exemption protects

"personnel and medical files and similar files the disclosure of which would constitute a clearly

unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The threshold question is

whether the requested information implicates a "substantial, as opposed to a *de minimis*, privacy

interest." Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989).  If an

agency clears this threshold, a court must then weigh that privacy interest against any public

interest in disclosure.  Multi Ag Media LLC v. U.S. Dep't of Agriculture, 515 F.3d 1224, 1229–

30 (D.C. Cir. 2008).  "The only relevant public interest in disclosure to be weighed in this

balance is the extent to which disclosure would . . . contribut[e] significantly to public

understanding of the operations or activities of the government."  Bartholdi Cable Co. v. FCC,

114 F.3d 274, 282 (D.C. Cir. 1997) (cleaned up).  The Service's two sets of Exemption 6

withholdings mostly pass this test, with one exception for realtors' redacted contact information.[4]

The first piece of information that the Forest Service is withholding under Exemption 6 is

a Service employee's work cell phone number that appeared in the appraisals.  Scofield Decl.

¶ 13.  The Forest Service explains that it "has released the employee's office phone number and

email address, which are the proper points of contact for members of the public," but believes

that releasing the employee's cell phone number would unnecessarily intrude upon the

employee's privacy "given that Forest Service employees generally are expected to carry their

work cell phone[s] . . . on their persons outside of the office and normal work hours."  Id.  The

Court agrees (and wonders why COWPL would persist in objecting to this withholding).  As

courts in this district have recognized, "[c]ell phone numbers implicate a different privacy

---

[4]  This framework, which requires showing a substantial privacy interest, bakes into its
assessment the foreseeable harm requirement under 5 U.S.C. § 552(a)(8)(A)(i).

interest from landline office phone numbers because employees carry cell phones with them outside the office and regular work hours."  Smith v. U.S. Dep't of Treasury, No. 17-cv-1796 (TSC), 2020 WL 376641, at *4 (D.D.C. Jan. 23, 2020).  "Disclosing the numbers of work cell phones, which employees maintain in their homes and on their person, could subject them to the type of harassment exemption 6 was designed to prevent."  Id.  The Court accordingly concludes that the cell phone number here implicates a substantial privacy interest.  On the other side of the ledger, there is limited public interest in disclosing the cell phone number because the public can readily contact the official by emailing him or dialing his landline.  The balance of interests is thus lopsided against disclosure.

The second tidbits that the Service has redacted under Exemption 6 consists of the cell phone numbers and an email address of private citizens who were involved in recent sales of comparable parcels of land but not connected to the land exchange itself.  Scofield Decl. ¶ 14. The Forest Service notes that it has already disclosed these private citizens' names but insists that releasing their contact information risks subjecting them to annoying or harassing calls or "unwanted contact from realtors, marketers, and other solicitors based on these individuals' recent real estate transactions" without "providing any additional insight or information about the proposed land exchange."  Id. ¶ 15.  The Court agrees to the extent the redactions involve the truly private contact information of citizens who bought comparable property in the surrounding area.  For this class of individuals, it is well-accepted that their private contact information implicates a substantial privacy interest.  See, e.g., Hall & Assocs. v. EPA, No. 19-cv-1095 (RC), 2020 WL 4673411, at *5 (D.D.C. Aug. 12, 2020) ("Courts in this District have routinely held that release of privately held email addresses would implicate a privacy interest."); Pejouhesh v. USPS, No. 17-cv-1684 (RDM), 2019 WL 1359292, at *6 (D.D.C. Mar. 26, 2019) ("[T]elephone

numbers are precisely the sort of bits of personal information the release of which would create a palpable threat to privacy." (cleaned up)).  Meanwhile, COWPL has advanced no real argument for why disclosing these citizens' contact information will shed any light on the Forest Service's operations.  The Court therefore "need not linger over the balance" because "something, even a modest privacy interest, outweighs nothing every time."  Horner, 879 F.2d at 879.

But as COWPL contends, see Opp'n to MSJ at 32–33, the Forest Service papers over some key facts when suggesting that the records withheld under Exemption 6 consist solely of the contact information of individuals who recently bought nearby properties, see MSJ at 16. COWPL notes in its opposition —and the Forest Service acknowledges in its reply—that some of the material withheld under Exemption 6 consists of contact information for real estate agents who marketed and sold comparable parcels to those included in the land exchange.  Opp'n to MSJ at 33; Forest Service Reply at 10–11.  COWPL contends it is disingenuous to say that disclosure of realtors' contact information would risk unwanted intrusions and solicitations when "realtors regularly publish their contact information and market their services to the public to generate business, including publicizing sales of the parcels at issue in this exchange."  Opp'n to MSJ at 33.  This reasonable claim that realtors publicly advertise their business contact information changes the calculus here because courts have held that, unlike privately held phone numbers and email addresses, "[p]ublicly available" contact information does "not implicate a privacy interest protected by Exemption 6."  Hall & Assocs., 2020 WL 4673411, at *5 (citing Multi Ag Media LLC, 515 F.3d at 1228).  The Court therefore does not even get to the balancing stage because the Forest Service fails to clear the initial threshold of showing a substantial privacy interest.

As a final note, COWPL asserts the Forest Service waived its right to Exemption 6 for any of the redacted records when it shared its materials with outside groups.  Opp'n to MSJ at 32–33.  But it once more fails to point to concrete evidence in the record that shows this specific information was shared with third parties.  More importantly, unlike the deliberative process privilege, the private privacy interests protected under Exemption 6 are not waived through selective disclosure.  See Sherman v. U.S. Dep't of Army, 244 F.3d 357, 363–64 & n.12 (5th Cir. 2001).  Accordingly, the Court will grant the Service's motion for summary judgment on its Exemption 6 redactions except for any withholdings of realtors' business contact information.

*       *       *

In sum, the Court will deny the Forest Service's motion for summary judgment with respect to the Exemption 5 withholdings but grant the motion for the Exemption 6 redactions— with one caveat regarding realtors' business contact information.  Because COWPL did not cross-move on the withholdings that the Service failed to justify, however, the Court cannot at this time award COWPL summary judgment on this matter.  The Court invites COWPL to file a motion for summary judgment on these remaining redactions.

B.  COWPL's Cross Motion

Turning to the cross motion, COWPL contends that the Forest Service has an unlawful policy and practice of withholding land exchange records until after the Service has officially approved of the documents and finalized the land exchange, even though it often provides this information to third-party proponents of these exchanges.  The Forest Service mounts two defenses in response.  First, the Service contends that COWPL did not raise a policy-or-practice claim in its complaint so the Court cannot entertain it at summary judgment.  Second, it argues that any such claim is now moot because the Forest Service has vitiated the policy that COWPL

challenges.  Both defenses fail.  COWPL adequately alleged a policy-or-practice claim, and that claim is not mooted by the Service's voluntary cessation because the Service cannot show that its intervening actions "completely or irrevocably eradicated the effects of the alleged violation" and that there is "no reasonable expectation that the alleged violation will recur."  Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) (citations omitted).  Advancing past these two defenses, the Forest Service lets its guard down by failing to defend its still existing policies, and any effort to do so would be futile because these policies clearly conflict with FOIA.  The Court will thus grant COWPL's cross motion and its request for a declaratory judgment.

### 1.  Pleadings

First, the Court rejects the Forest Service's argument that it cannot consider COWPL's cross motion because COWPL did not allege a policy-or-practice claim in its complaint.  Under Federal Rule of Civil Procedure 8, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought."  Fed. R. Civ. P. 8(a)(2), (3).  The purpose of this rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted).  In the context of a FOIA policy-or-practice claim, the plaintiff "must [plausibly] allege . . . that the agency has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing failure to abide by the terms of FOIA."  Muttitt, 926 F. Supp. 2d at 293 (cleaned up).

COWPL did exactly that in this case.  Paragraph 19 of the complaint alleges:

Plaintiff has requested, and has definite plans to continue to request, property value information created or obtained by federal agencies when scrutinizing federal land exchanges.  Plaintiff has been denied prompt access, based on agency policies that direct personnel to withhold information regarding property values

until after the NEPA process is complete, after administrative review is complete, and after final agency action is taken on a land exchange. All valuation information was created with the intention of sharing the agency records with non-federal persons early in the land exchange and NEPA processes. The federal agencies and personnel charged with overseeing land exchanges (Bureau of Land Management and U.S. Forest Service) have an unlawful policy of only sharing the valuation information with persons advocating for the land exchange, and denying access to Plaintiff and similarly situated persons. Plaintiff has been denied access to appraisals for federal land exchanges on multiple occasions.

Compl. ¶ 19. This paragraph includes all the elements necessary to allege a policy-or-practice

claim. First, it alleges that the Forest Service has a policy of withholding valuation materials

from FOIA requesters until after the land-exchange process is finalized even though it regularly

shares these materials with outside parties who support the exchanges. It further claims COWPL

has been denied access to appraisals on multiple occasions based on these policies and practices.

Additionally, to show it has standing to assert this claim and seek declaratory or injunctive relief,

COWPL alleges it has "definite plans to continue to request" this information in the future and

will thus continue to suffer harm due to these policies absent judicial intervention. Later in the

complaint when describing the statutory framework, COWPL calls out that "FOIA provides

statutory authority to refer this matter to the Special Counsel to investigate and make binding

recommendations to remedy an agency's conduct *and policies* based on potentially arbitrary and

capricious circumstances surrounding the withholding of agency records." Id. ¶ 40 (emphasis

added). And then in its claim for relief, COWPL reiterates that it "seeks remedy for its statutory

right to promptly access all agency records provided to non-agency third parties, particularly

those provided to Western Land Group, Inc. on October 26, 2020. That right was *violated by

agency policies and practices* designed to avoid FOIA disclosure of controversial land exchange

information." Id. ¶ 86 (emphasis added). Together, these statements adequately allege a policy-

or-practice claim and provided the Service with sufficient notice that COWPL was challenging

not just its specific redactions to the produced documents but also the Forest Service's broader policies.

The Forest Service notes that COWPL's complaint included only a single count entitled "Violation of FOIA: Unlawfully [W]itholding Agency Records Responsive to FOIA Request." Forest Service Reply at 20.  It therefore compares this case to Muttitt v. Department of State, where the plaintiff "concede[d] that he did not state a separate cause of action for any policy or practice," and the court found that Rule 8 was not satisfied.  926 F. Supp. at 293.  But while it might have been preferable if COWPL had broken out its claims, Rule 8 was meant to move us beyond the rigidity of the common-law pleading system by enacting a notice standard under which "pleadings are to be construed liberally so as to do justice."  5 Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 1202 (4th ed. 2023); see also Fed. R. Civ. P. 8(e). Refusing to entertain the policy-or-practice claim because COWPL consolidated its claims when it otherwise provided sufficient notice and adequately stated a policy-or-practice claim would be a reversion to the antediluvian days before the Field Code and the opposite of just.  That sets this case apart from Muttitt, where the only allegations in the complaint that even hinted at a policy-or-practice claim were stray remarks in the prayer for relief asking the court to "[o]rder [the defendants] to grant [the plaintiff] public interest fee waivers where appropriate," and "[g]rant such other relief as the Court may deem just and proper."  Id. at 293.  The court in Muttitt rightly recognized that "[p]ermitting the plaintiff to raise a policy-or-practice claim for the first time at summary judgment based solely on vague language in his Prayer for Relief would run contrary to Rule 8's purpose."  Id. at 294.  But the cryptic allusion buried in the prayer for relief in Muttitt is a far cry from the concrete allegations in COWPL's complaint.

A fair reading of COWPL's complaint reveals that it adequately alleged a policy-or-practice claim and placed the Forest Service on notice that it would have to defend its challenged policies.  This claim is therefore fair game for summary judgment.

### 2. Mootness

The Forest Service nonetheless insists that any such claim is now moot because it has effectively vitiated the challenged policies.  "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983).  Even if a case presented a live case or controversy when the plaintiff filed its complaint, an intervening event may render a claim moot. See Leonard v. U.S. Dep't of Def., 38 F. Supp. 3d 99, 104 (D.D.C. 2014).  Yet, "[u]nlike some jurisdictional questions such as standing or ripeness, the party asserting mootness . . . bears the initial heavy burden of establishing that the case is moot." Atlas Brew Works, LLC v. Barr, 391 F. Supp. 3d 6, 11 (D.D.C. 2019) (citation and quotation marks omitted).  That heavy burden carries over to cases where the intervening cause is the defendant's "voluntary cessation" of the challenged conduct.  Nat'l Black Police Ass'n, 108 F.3d at 349; see also Payne, 837 F.2d at 491–92 (describing the "heavy burden" of proving voluntary cessation).  In such cases, the defendant must prove that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) [the] interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." Nat'l Black Police Ass'n, 108 F.3d at 349 (citation and quotation marks omitted).  The Forest Service has failed to satisfy that burden here because its intervening actions have not entirely solved the policy problem or cured the plaintiff's ongoing injuries.

In her second declaration, Ms. Scofield explains that the Forest Service is in the midst of updating its Manual and Handbook regarding FOIA compliance.  Second Scofield Decl. ¶ 2.  She

states that the "Forest Service has finished drafting these revisions, and is currently in the process of bringing them into compliance with Section 508 of the Rehabilitation Act of 1973 prior to their final approval by senior agency leadership."  Id.  Particularly relevant here, Scofield informs us that the "revision of Section 5412 of the Manual, 'Requests for appraisal or appraisal information under Freedom of Information Act,' will remove all language directing FOIA processors to withhold [finalized] [a]ppraisals and related materials under Exemption 5 based on the deliberative process privilege."  Id. ¶ 3.  In the meantime, Scofield "instructed the FOIA Coordinators" at a meeting in Washington in March 2022 that, "effective immediately, the Forest Service will no longer withhold appraisals approved for agency use, or portions thereof, and related materials under Exemption 5 based on the deliberative process privilege."  Id. ¶ 4.  She "further explained that even before an [a]ppraisal is approved for agency use, the Forest Service cannot withhold, under Exemption 5 based on the deliberative process privilege, any materials that have been shared with individuals or entities outside the Forest Service (other than the appraiser)."  Id.  She told these FOIA Coordinators that "the proposed revisions to the Manual and Handbook will reflect these changes, and that while these revisions remain pending, the instructions [she] provided during the meeting supersede any inconsistent provision in the current versions of the Manual and Handbook."  Id.  Scofield then concludes by reassuring the Court that "[n]either the Department of Agriculture nor more senior Forest Service officials have overridden [her] decisions with respect to the policy at issue."  Id. ¶ 5.

The Forest Service asserts that this case is moot because "there [cannot] be any doubt as to Ms. Scofield's authority and competence to provide this assurance."  Forest Service Reply at 28.  But greater assurance is required to deprive this Court of jurisdiction to consider the matter.

First, Ms. Scofield's declaration makes clear the challenged policies have not yet been revised and remain a part of the Forest Service Manual.  The Service is thus asking the Court to ignore the agency's rule on the books and take Scofield's conflicting word for it because no higher ups at the agency have contradicted her.  That critical fact distinguishes this case from Porup v. CIA, 997 F.3d 1224 (D.C. Cir. 2021), on which the Service chiefly relies.  In Porup, the CIA initially refused to process the plaintiff's request because it construed an executive order to bar disclosure related to assassination conspiracy theories but reversed course when it "adopted a new policy for processing requests of the sort submitted by Porup."  Id. at 198.  The only CIA policy on the matter was therefore the internal guidance stating that the agency could not categorically refuse to process these types of requests.  Under these conditions, the D.C. Circuit upheld this Court's determination that Porup's policy-or-practice claim was moot.  Id. at 201–03.  Here, by contrast, the only official policies are those that appear in the Forest Service Manual.  Mary Scofield does not purport to have the power to make or modify these official policies.  Nor could she.  Ms. Scofield is not the Department of Agriculture's Chief FOIA Officer.  See 5 U.S.C. § 552(j)(1) ("Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency[.]").  And even if she were, her recommendations would still be "subject to the authority of the head of the agency."  Id. § 552(j)(2)(C).  The Forest Service instead relies on Scofield's assertion that these more senior officials at the agency have not "overridden [her] decisions with respect to the policy at issue."  Second Scofield Decl. ¶ 5.  Yet the fact that she has not been overruled does not transform her verbal statements into official agency policy.  And the D.C. Circuit held in Payne Enterprises, Inc. v. United States that statements made by lower-level officials who cannot bind the agency cannot moot a case.  837 F.2d at 492; see also Porup, 997 F.3d at 1233 ("[T]he court [in Payne] rejected an affidavit offered by the government to

support its claim that the contested practice in that case had been voluntarily terminated . . . [because] the disputed affidavit did not purport to speak for the affiant's superiors in the agency, nor did it pledge future compliance by agency officials who were authorized to offer such an assurance."). The Court credits the Service's ongoing efforts to bring its policies in line with FOIA. But the proper manner to change the Service's policies is by revising its Manual. The Service may be in the process of rewriting the Manual's challenged rules, but this case is not moot until suitable revisions are actually enacted.

Second, while the Court has no reason to question Ms. Scofield's description of her instructions to the Service's FOIA staff, the record casts serious doubt on their effectiveness. Forest Service officials appear to have continued to withhold requested records from COWPL for months after her March 2022 directive because the exchange was not finalized even though the Service had shared much of this material with outside entities, such as the Western Land Group. See COWPL Reply at 6–9. When officials are carrying on and continuing to apply the rules written into the Handbook, the Court cannot conclude that Scofield's directives have irrevocably eradicated COWPL's injury and that there is no reasonable expectation that the alleged violation will recur.

Finally, even if Scofield's statement somehow amended the Forest Service's policies, it would still not bring the Service into compliance with FOIA because her directive reiterates the Manual's requirement that officials withhold valuation documents until they are "approved for agency use." Second Scofield Decl. ¶ 4. But there is no blanket FOIA exemption for draft materials that have not been approved by the agency, and the Service cannot layer additional restrictions on top of the law. Essentially the Service is treating all draft appraisals as if they fall under Exemption 5. Although it may be true that "a draft document will typically be

predecisional because . . . it is not yet final," Sierra Club, 141 S. Ct. at 788, the D.C. Circuit has squarely rejected the view that all material found in drafts is walled off from disclosure by the deliberative process privilege.  In Arthur Anderson, the circuit held that its prior decision in "Coastal States foreclose[d] the . . . argument that any document identified as a 'draft' is per se exempt.  Even if a document is a 'draft of what will become a final document,'" the court insisted that we "must also ascertain 'whether the document is deliberative in nature.'"  679 F.2d at 257 (quoting Coastal States, 617 F.2d at 866).  The Circuit doubled down on this position recently when writing that, if there were "any doubt that drafts are not automatically exempt under the deliberative process privilege, [the Circuit] dispelled it last term in Reporters Committee for Freedom of the Press v. FBI, where the government 'failed to identify any deliberative component' to draft PowerPoint slides."  Jud. Watch, Inc., 20 F.4th at 55–56 (quoting Reps. Comm., 3 F.4th at 367).  These statements apply with equal force to draft appraisals, as evidenced by the Exemption 5 analysis above.  The Forest Service is required to release all responsive appraisal documents—even if those documents have not been officially blessed by the agency—unless it can show that the requested information falls within an exemption and that releasing the material would cause foreseeable harm.  While some material in draft appraisals may satisfy this statutory test, the Service is required to perform this analysis for each document and then produce all reasonably segregable, non-exempt information.  See 5 U.S.C. § 552(a)(8)(A)(ii)(I), (b).  Applying a blanket restriction over an entire category of "draft" documents clearly conflicts with this more tailored approach, reinforcing the fact that COWPL's policy-or-practice claim is not moot.

### 3.  Merits

On the merits, the Forest Service wisely does not try to defend its (still-existent) policies and practices.  The Service is not permitted to withhold records because a land exchange has not been finalized, especially when it has already released these documents to outside parties.  Nor can the Service categorically refuse to release any documents that it has not officially approved for agency use.  Instead, the Service in each case must apply FOIA's rules to determine whether the information falls within a statutory exemption, whether it has waived the exemption through prior disclosures, whether releasing the information will cause harm, and whether there is a way to reasonably segregate and release all non-exempt information.

### 4.  Remedy

As to the remedy, COWPL primarily seeks declaratory relief stating that the challenged policies violate FOIA, which the Court has provided through this decision.  COWPL also asks this Court to refer the matter to a Special Counsel under 5 U.S.C. § 552(a)(4)(F) for additional investigation and recommendations to remedy the Forest Service's violations.  The Court does not believe such referral is appropriate in this case because it is confident that the Forest Service will act to bring its policies into compliance with FOIA, as interpreted in this opinion.

**IV.  Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 26] Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.  It is further

**ORDERED** that [Dkt. No. 30] Plaintiff's Cross Motion for Summary Judgment is GRANTED.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>September 11, 2023</u>